UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| COMMODITY FUTURES TRADING COMMISSION, | § | |
|---|---|---|
| *Plaintiff,* | § | |
| v. | § | Civil Action No. 3:20-CV-02985-X |
| KENZLEY RAMOS<br>*also known as* Kenzley Jacobs<br>*also known as* Anthony "Tony" David McKinney<br>*also known as* Anthony Green | § | |
| *Defendant.* | § | |

## **MEMORANDUM OPINION AND ORDER**

The Commodity Futures Trading Commission filed a civil enforcement lawsuit alleging that Kenzley Ramos violated the Commodity Exchange Act and the Commission's regulations. Kenzley did not answer or otherwise respond to the complaint. The Clerk entered a default [Doc. No. 18]. And the Commission filed a Motion for Final Judgment by Default [Doc. No. 21]. For the reasons below, the Court **GRANTS** the motion for final judgment by default.

### **I. Factual Background**

The Commodity Futures Trading Commission is an independent federal regulatory agency charged by Congress with the administration and enforcement of

1

the Commodity Exchange Act.[1]  To that end, the Commission promulgates and enforces regulations consistent with its authority from Congress.

The Commission alleges that Ramos operated a fraudulent commodity pool violating several sections of the Act and the Commission's regulations.  According to the Commission, Ramos solicited members of the public through Craiglist advertisements promoting participation in a pool to trade binary options and forex.  In the advertisements, Ramos promises to act as the participants' day trader and use funds pooled from the participants to trade forex.  The advertisements guarantee that a pool participant's investment will produce profits without risk, and also guarantees that Ramos will refund any losses to a particular participant from his personal account.  The advertisements also include images and statements claiming to demonstrate the current account balance and profit margins of the pool.  As a result of these communications, many individuals agreed to participate in the pool and sent Ramos money to fund the investment.

The Commission alleges that Ramos's representations were false.  According to the Commission, in fact, Ramos did not have a trading account, did not trade in binary options or forex as promised, and did not receive promised returns from trading or refund investments to participants.  Instead, Ramos held the participants' money in his own personal account and used it to spend on personal item or withdraw as cash.  The Texas State Securities Board investigated Ramos's activity, filed an Emergency Cease and Desist Order directing Ramos to end the fraudulent activity,

---

[1] 7 U.S.C. §§ 1–26.

and provided Ramos notice of the order. According to the Commission, however, Ramos continues to maintain and promote the allegedly fraudulent trading scheme.

The Commission filed this complaint alleging several violations of federal law and requesting a permeant injunction, restitution, and a civil monetary penalty. Ramos never filed a response to the complaint. The Commission requested, and the Clerk of the Court entered, an entry of default. The Commission then filed this Motion for Final Judgment by Default, urging the Court enter a final judgment containing the remedies it requested in the complaint.

## II. Legal Standards

Federal Rule of Civil Procedure 55(b)(2) provides that, in proceedings not involving a certain sum:

> the party must apply to the court for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to:
> (A) conduct an accounting;
> (B) determine the amount of damages;
> (C) establish the truth of any allegation by evidence; or
> (D) investigate any other matter.

A default requires a court to accept as true a plaintiff's well-pled allegations in a complaint.[2]

---

[2] *See, e.g.*, *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 499 (5th Cir. 2015) (a complaint is well pled when "all elements of [a] cause of action are present by implication"); *In re Dierschke*, 975 F.2d 181, 185 (5th Cir. 1992) ("It is universally understood that a default operates as a

3

In determining whether to enter a default judgment, courts conduct a two-part analysis. First, courts examine whether a default judgment is appropriate under the circumstances.[3] Relevant factors (called the *Lindsey* factors) include: (1) whether disputes of material fact exist; (2) whether there has been substantial prejudice; (3) whether grounds for default are clearly established; (4) whether the default was caused by a good faith mistake or excusable neglect; (5) the harshness of a default judgment; and (6) whether the court would be obliged to grant a motion from the defendant to set the default judgment aside.[4] Second, the Court assesses the merits of the plaintiff's claims and whether there is a sufficient basis in the pleadings.[5]

### III. Analysis

The Court deems the facts on liability to be admitted and finds Ramos not to be incompetent, a minor, or in active military service. While Rule 55 allows for hearings, it does not command them. Here, the Commission served Ramos a copy of the motion for default judgment, notifying him of his duty to respond. Ramos did not respond. The Commission's motion is supported by the declaration of the Senior Futures Trading Investigator assigned to this case.[6] As a result, ruling without a hearing is proper.

---

deemed admission of liability.").

[3] *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998).

[4] *Id.*

[5] *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).

[6] *See* Doc. 22, Attachment 1.

## A. Procedural Appropriateness of Default Judgment

The Court now turns to the six *Lindsey* factors. First, there are no material facts in dispute because Ramos did not file a responsive pleading. Second, regarding substantial prejudice, the Ramos's failure to respond could bring adversarial proceedings to a halt. The Commission requests, among other things, for the Court to enjoin Ramos and anyone acting with him to cease violations of the federal regulations and order restitution paid to those who sustained loss as a result of the violations.[7] Delaying court proceedings could substantially prejudice the Commission in its duty to enforce federal regulations and serve the public, but will not prejudice Ramos. Third, Ramos's continual failure to respond or participate in this ligation clearly establishes grounds for the default. Fourth, regarding mistake or neglect, there is no reason to believe that Ramos is acting under a good faith mistake or excusable neglect. Fifth, regarding the harshness of a default judgment, the judgment would grant a permanent injunctions designed to cease the violations of federal regulations, pay restitution to injured victims, and pay a civil penalty proscribed by federal regulations.[8] Sixth, regarding whether the court would grant a motion to set aside the default, the pleadings, the lack of response, and the consequential failure to plead a meritorious defense indicate a lack of good cause for the Court to set aside the default judgment. Thus, the Court concludes a default judgment is procedurally appropriate under these circumstances.

---

[7] Doc. No. 1 at 21–22.

[8] *Id.*

## B. Sufficiency of the Commission's Complaint

Next, the Court assesses the merits of the Commission's claim considering its complaint. Although Ramos, by virtue of his default, is deemed to have admitted the Commission's well-pled allegations, the Court must nonetheless review the complaint to determine whether it established a viable claim for relief.[9]

### *Count One: Violations of 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)*

Under Section 4b of the Act it is unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person;
> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.][10]

Further, under Regulation 5.2(b) it is also unlawful:

> [F]or any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:
>
> (1) To cheat or defraud or attempt to cheat or defraud any person;
> (2) Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or
> (3) Willfully to deceive or attempt to deceive any person by any means

---

[9] *Nishimatsu*, 515 F.2d at 1206.

[10] 7 U.S.C. § 6b(a)(2)(A)–(C).

6

whatsoever.[11]

The Commission's Complaint alleges that Ramos used Craigslist advertisements, direct electronic communications, and written agreements to communicate with prospective pool participants and solicit participation in his trading program.[12] The communications made several representations regarding guaranteed returns and reimbursements, as well as representations about the successes of other pool participants.[13] The Complaint alleges that these representations were false; that Ramos did not engage in any trading and instead misappropriated the pool funds for personal use.[14] The Complaint alleges that Ramos did in fact "cheat or defraud" the pool participants through the solicitation to pool participants, acceptance of funds, and misappropriation of funds.[15] And it alleges that Ramos's statements and actions were "willful" and by "any means whatsoever."[16] Therefore, the Commission established a viable claim for violations of 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b).

## 2. Count 2: Violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4

Section 4c of the Act provides that:

No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call",

---

[11] 17 C.F.R. § 5.2(b).

[12] Doc. No. 1 at 5.

[13] *Id.*

[14] *Id.* at 8.

[15] *Id.* at 8–9, 11–12.

[16] *Id.*

7

"advance guaranty", or "decline guaranty", contrary to any rule, regulation or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.[17]

And Regulation 32.4 provides:

In or in connection with any offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly:

(a) To cheat or defraud or attempt to cheat or defraud any other person;
(b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or
(c) To deceive or attempt to deceive any other person by any means whatsoever.[18]

The Complaint alleges that participation in Ramos's trading pool constitutes a commodity option transaction regulated by the Act.[19] And it alleges that the previously identified solicitation, misrepresentation, and misappropriation constitutes cheating and defrauding, making a false report or false statement, and deceiving another person in connection with a commodity option transaction.[20] Therefore, the Commission established a viable claim for violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

### 3. Count Three: Violations of 7 U.S.C. § 6o(1)(A)–(B)

Section 4*o* of the Act establishes that:

(1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or

---

[17] 7 U.S.C. § 6c(b).

[18] 17 C.F.R. § 32.4.

[19] Doc. No. 1 at 13.

[20] *Id.*

8

associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.[21]

The Act defines a commodity pool as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests,"[22] and a Commodity Pool Operator as:

any person—

(i) engaged in a business that is of the nature of a commodity pool . . . and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—

(I) commodity for future delivery, security futures product, or swap;
(II) agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title.[23]

The Complaint alleges that the pool in this case consisted of funds gathered from other individuals that Ramos held out as operating for the purpose of trading commodity interests.[24] And it alleges that Ramos operated this pool by soliciting others to participate and accepting funds from pool participants.[25] Combined with

---

[21] 7 U.S.C. § 6o(1)(A)–(B).

[22] 7 U.S.C. § 1a(10).

[23] *Id.* § 1a(11)(A).

[24] Doc. No. 1 at 15.

[25] *Id.*

9

the previously identified conduct, the Complaint alleges that Ramos used mails or interstate commerce defraud pool participants and prospective participants while acting as a Community Pool Operator, as defined by the Act.[26]  Therefore, the Commission established a viable claim that Ramos violated 7 U.S.C. § 6o(1)(A)–(B).

## 4. Count Four: Violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc); 6m(1), and 17 C.F.R. § 5.3(a)(2)

Section 4m(1) of the Act makes it unlawful for a Commodity Pool Operator "to make use of the mails or any means or instrumentality of interstate commerce in connection with his business" as a Commodity Pool Operator, unless the Operator is registered with the Commission.[27]  Similarly, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) makes it unlawful to "operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [retail forex agreements, contracts, or transactions] . . . ."[28]  And Regulation 5.3(a)(2)(i) requires those that meet the definition of a retail forex Commodity Pool Operator to register as a Commodity Pool Operator with the Commission.[29]

The Complaint alleges that the Ramos used the mails or means of interstate commerce to solicit participants and receive pools funds; the work of a Commodity Pool Operator.[30]  And it alleges that Ramos, at all times in the relevant period, was

---

[26] *Id.* at 15–16.

[27] 7 U.S.C. § 6m(1).  This prohibition is subject to certain exceptions not relevant in this case.

[28] 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc).

[29] 17 C.F.R. § 5.1(d)(1).  There are exceptions to this regulation in circumstances not relevant to this case.

[30] Doc. No. 1 at 17.

10

not registered with the Commission as a Commodity Pool Operator or retail forex Commodity Pool Operator.[31] Therefore, the Commission established a viable claim that Ramos violated 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc); 6m(1), and 17 C.F.R. § 5.3(a)(2).

*5. Count Five: Violations of 17 C.F.R. § 4.20(a)(1), (b)*

Regulation 4.20(a)(1) requires Commodity Pool Operators, regardless of whether they are registered with the Commission, to operate their commodity pool as a legal entity separate from that of the Operator.[32] And Regulation 4.20(b) prohibits Commodity Pool Operators from receiving pool participants' funds in any name other than that of the commodity pool.[33]

The complaint alleges that, at all times during the relevant period, Ramos failed to operated the commodity pool as a legal entity separate from himself, instead operating the pool in his own name and storing funds in his personal accounts.[34] The complaint also alleges that Ramos received funds in his own name, rather than in the name of a legally cognizable commodity pool.[35] Therefore, the Court determines the Commission established a viable claim that Ramos violated 17 C.F.R. §§ 4.20(a)(1) and 4.20(b).

---

[31] *Id.* at 9.

[32] 17 C.F.R. § 4.20(a)(1).

[33] 17 C.F.R. § 4.20(b).

[34] Doc. No. 1 at 9–10.

[35] *Id.* at 10.

### 6. Count Six: Violations of 17 C.F.R. §§ 4.21, 4.22

Under Regulation 4.21(a)(1), Commodity Pool Operators are required to "deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool . . . by no later than the time it delivers to the prospective participant a subscription agreement for the pool."[36] And under Regulation 4.22, Commodity Pool Operators are required to provide periodic account statements to investors.[37]

The complaint alleges that Ramos failed to deliver or cause to be delivered any disclosures to pool participants, much less one resembling the requirements of Regulation 4.21(a)(1).[38] Likewise, the complaint alleges that Ramos never provided an account statement of any form to the pool participants.[39] Therefore, the Court determines the Commission established a viable claim that Ramos violated 17 C.F.R. §§ 4.21 and 4.22.

### C. Remedies

The Commission requests the default judgment include the following remedies: (1) a permanent injunction; (2) restitution for the losses sustained by the customers proximately caused by Ramos's violations; and (3) civil monetary penalties.

### 1. Permanent Injunction

Section 6c of the Act, authorizes injunctions:

---

[36] 17 C.F.R. § 4.21(a)(1).

[37] 17 C.F.R. § 4.22. These periodic account statements require the disclosure of various gains and losses and other information. *Id.*

[38] Doc. No. 1 at 10.

[39] *Id.*

[w]henever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder . . . the Commission may bring an action in the proper district court of the United States . . . to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder.[40]

The Commission's has to authority to seek an injunction enforcing compliance with the relevant statutes and regulations, the Court found that the Commission established viable claims that Ramos violated various statutes and regulations, and the requested injunction enforces compliance with the laws involved.[41] Therefore, the Court will issue the requested injunction in the final judgment.

## *2. Restitution*

Section 6c(d)(3) of the Act authorizes the Commission to seek equable remedies "on any person found in the action to have committed any violation," including "restitution to persons who have sustained losses proximately caused by" the violation, in amount of the loss sustained.[42] The Court found that the Commission established valid claims that Ramos violated the relevant statutes and regulations. The Commission also alleged and provided evidence that Ramos's violations resulted in him fraudulently receiving at least $27,556.00 from pool participants.[43] Therefore, the Court will order restitution in this amount in the final judgment.

## *3. Civil Monetary Penalties*

---

[40] 7 U.S.C. § 13a-1(a).

[41] *See* Doc. No. 22 at 23–25.

[42] 7 U.S.C. § 13a-1(d)(3).

[43] Doc. No. 22, Attachment 1 at 6.

13

Section 6c(d)(1) authorizes the Commission to seek a civil monetary penalty "on any person found in the action to have committed any violation."[44] The Act allows the Court to impose "a civil penalty in the amount of not more than the greater of $100,000 or triple the monetary gain to the person for each violation."[45] The Commission asks the Court to impose a civil monetary penalty in the amount of $82,668.00—three times the $27,556.00 Ramos received from pool participants.[46]

The Court found that the Commission established valid claims that Ramos violated the statutes and regulations at issue. And the law authorizes a monetary penalty in the amount requested. Therefore, the Court will levy the requested monetary penalty in the final judgment.

### IV. Conclusion

For the forgoing reasons, the Court **GRANTS** the motion for default judgment. By separate order, the Court will issue a final judgment.

**IT IS SO ORDERED** this 6th day of July, 2021.

 

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[44] U.S.C. § 13a-1(d)(1).

[45] *Id.*

[46] Doc. No. 22 at 27.